215 F.2d 924
 103 U.S.P.Q. 1
 D. B. COLE, Appellant,
v.
HUGHES TOOL COMPANY, a Corporation, Appellee.
B. F. CONAGHAN, Appellant,
v.
HUGHES TOOL COMPANY, a Corporation, Appellee.
HUGHES TOOL COMPANY, a Corporation, Appellant,
v.
R. W. FORD, Appellee.
 Nos. 4785-4787.
 United States Court of Appeals, Tenth Circuit.
 Sept. 15, 1954.
 
 Robert F. Davis, Washington, D.C., and Charles m. McKnight, Tulsa, Okl., for appellants in Nos. 4785 and 4786 and for appellee in No. 4787.
 Edward A. Haight, Chicago, Ill. (George I. Haight, Chicago, Ill., Robert F. Campbell, Houston, Tex., Ray L. Smith, Los Angeles, Cal., and Lynn Adams, Oklahoma City, Okl., were with him on the briefs), for appellee in Nos. 4785 and 4786 and for appellant in No. 4787.
 Before PHILLIPS, Chief Judge, and BRATTON, HUXMAN, MURRAH and PICKETT, Circuit Judges.
 PHILLIPS, Chief Judge.
 
 
 1
 These are appeals from judgments in three cases, of identical nature, commenced by the Hughes Tool Company.[1] One case, brought against Ford, was commenced in the Eastern District of Oklahoma. The other two cases, brought against Cole and Conaghan, respectively, were commenced in the Western District of Oklahoma. Each defendant is engaged in reconstructing or rebuilding rotary drilling bits used for drilling oil and gas wells manufactured by Hughes and leased by it to drillers. Such reconstructing or rebuilding is commonly called and will hereinafter be referred to as retipping.
 
 
 2
 Each complaint contained three counts: (1) for patent infringement; (2) for conversion of Hughes bits; and (3) for interference with Hughes' property and contract rights. The defendant in each case filed a counterclaim charging violations of Secs. 1 and 2 of the Sherman Act[2] and sought damages under Sec. 4 of the Clayton Act.[3] For convenience, the three cases were consolidated for trial, but not for decision. The trial judges sat together. Chief Judge Edgar S. Caught decided the Cole and Conaghan cases and Judge William Robert Wallace decided the Ford case.
 
 
 3
 The patents in suit are Fletcher No. 1,856,627; Scott and Garfield No. 1,983,316, and Scott, et al., No. 2,333,746.
 
 
 4
 In the Cole and Conaghan cases, each of the three patents in suit was adjudged to be valid and infringed and the respective defendants were adjudged to have converted Hughes' bits and to have interfered with Hughes' property and contract rights, and the defendants were enjoined from infringing Claims 1 and 4 of Patent No. 2,333,746 and from interfering with Hughes' rights in its leased bits, and the counterclaims were dismissed. The other two patents had expired during the pendency of the suits.
 
 
 5
 In the Ford case, Patents Nos. 1,856,627 and 1,983,316 were adjudged to be valid and infringed and Patent No. 2,333,746 was adjudged to be invalid for want of invention. In the Ford case, the court further found that the defendant had converted Hughes' bits and interfered with Hughes' property and contract rights, but denied relief on the ground that Hughes had violated Secs. 1 and 2 of the Sherman Act and Sec. 3 of the Clayton Act.
 
 
 6
 On the counterclaim in the Ford case, the court adjudged that Hughes had violated Secs. 1 and 2 of the Sherman Act and Sec. 3 of the Clayton Act, enjoined further violations of such Acts by Hughes, and ordered an accounting.
 
 
 7
 In rotary drilling, the bit is the key piece of equipment and the remainder of the drilling rig is designed to serve the bit. Such additional equipment includes: A drill stem to which the bit is attached; a kelly joint and swivel used in rotating the bit; blocks, derrick and draw works to raise and lower the bit; mud pumps to circulate the flushing fluid; and a source of power. The cost of a large drilling rig for deep drilling is approximately $500,000. To operate the rig there are ordinarily three crews of five men each, each crew working eight hours a day, together with a tool pusher in charge of the rig. The cost of drilling varies from approximately $450 a day with a light rig in shallow formations to $1,500 per day with a large rig in deep formations. The requirements of a rock bit for rotary drilling are great and its structural design is subject to severe limitations. Obviously, a bit can be of no larger diameter than the hole which it drills. The limited space available must be so allotted as to secure the most desirable relationship among all the elements that are essential in an effective rotary drilling bit. Balance must be achieved between tooth depth, shell dimensions and bearings. Drilling conditions vary widely. Formations vary in hardness, tilt, and abrasiveness. It has been found desirable to provide bits that will obtain maximum performance in each of the varying depths, formations, and other drilling conditions. The cost of operating a rig may run as much as $40 to $50 per hour. Hence, it is of great importance that a bit drill as rapidly as possible. It is important that the bit minimize fatigue on the drill stem and have adequate clearance, so that it may be lowered into the well and raised out of the well. The bit must maintain a full-gauge hole. Some formations are sticky and tend to adhere to the cutters. The bit must be designed to shed formation cuttings and permit facility of cleaning by the flushing fluid. Of paramount importance is the number of feet that a single bit will drill in a given formation. At depths of 10,000 feet it will take approximately eight hours to change the bit. At such depths, the cost of changing a bit may be several times the cost of the bit itself. From the foregoing it will be apparent that the designing of an efficient rotary drilling bit is both difficult and exacting.
 
 
 8
 In the years 1929 and 1930, Hughes manufactured what was known as its 'Simplex' bit, which had removable cones. It made and sold two types of cones for that bit. During those years, its cones were sold to supply stores, which supplied oil companies and drilling contractors with the cones.
 
 
 9
 As early as 1931, Hughes had established a research department with a central research laboratory at Houston, Texas, with a laboratory staff and field personnel. Its research department had two primary objectives-- to reduce the number of bits required to complete the drilling of a well and to increase the drilling rate of its bits, thereby reducing the drilling costs.
 
 
 10
 In 1931, there was an unusually large amount of rotary drilling of oil and gas wells in East Texas. A large part of the Hughes research field personnel was concentrated in that area, and Hughes began a very extensive observation of the performance of its bits in the field and made further examinations, tests and analyses of its bits in its central research laboratory. It was then that Hughes adopted the practice theretofore used by other bit manufacturers, of leasing, instead of selling, its bits. Under the leasing arrangement, the bits, when they had served their useful life, were returned to Hughes for field examinations and for examinations, tests and analyses in its research laboratory. Comparisons were also made of the performance of different bits and of the performance of particular bits in particular formations and under particular drilling conditions. With the expansion of its field organization, the business of Hughes, between 1932 and 1934, was changed from that of manufacturing and selling to supply stores two types of conical cutters for its Simplex bits, to a bit service, which embraced many types of bits, each type being particularly adapted to a specific formation or drilling condition, and, pursuant to which, bits were delivered, under an informal lease, to oil companies and drilling contractors at the derrick floor, which were of the size and type best suited to the formations and conditions in which they were drilling. It was in 1934 that Hughes adopted a formal leasing contract, which contained the following provision: 'When the original cutter teeth and/or bearings have served their useful life, the user will surrender the bits to Hughes Tool Company upon request. In accepting delivery, the user agrees not to surrender any of the tools as mentioned above to other than a duly authorized representative' of Hughes. Each bit is stamped with the words, 'Property of Hughes Tool co.'
 
 
 11
 Hughes maintains, at its central research laboratory, personnel and equipment to test bits, make metallurgical investigations and chemical analyses, compare performance of different bits, and carry on other like research. It maintains a field organization of approximately 175 men. These men deliver new bits to the drilling rigs of the users and pick up the wornout bits. It also maintains a staff of field engineers, stationed at division points, who examine used bits and check their performance. Beginning in 1931, and continuing to the present time, each bit produced by Hughes had been marked with an identifying serial number. Hughes' field men follow the life of each bit from the time it is received by the driller until the time it has served its useful life. They maintain records in which the bit is identified by its serial number and which set forth the footage drilled, hours run, weight carried, speed of rotation, quantity of fluid circulated, and formations drilled. They make certain that the right type of bit is delivered for the particular drilling conditions existing at each drilling rig. A field man examines the bits picked up, and, if he thinks further examination is desirable, sends them to field division points, or to the central research laboratory at Houston, Texas, accompanied by information with respect to each bit as to the conditions of use, formations drilled, and its performance. The information gathered by Hughes' field organization, as to the performance of its bits in particular formations and areas, under specific conditions, is made available to users of Hughes bits and is of substantial value to them.
 
 
 12
 Such research has enabled Hughes not only to eliminate flaws appearing in its bits, but to constantly improve the design and operating qualities of its bits, and to extend the useful life thereof.
 
 
 13
 Illustrative of the meticulous care with which Hughes undertakes to discover and correct even minor defects in its bits was its action with respect to reported failures at the spear point on the number one cone of a specific size and type of Hughes bit. Moore, a field engineer, who had learned of two such failures, was asked to investigate. He examined 260 dull bits of the specific size and type in which the failures had been reported. Each of the bits apparently had made a satisfactory run, but, in a few instances, had manifested potential weakness. The central research laboratory made suggestions for correcting the defect by shortening the pilot pin on the cone and changing the carburization. By changing the design and the heat treatment of a small portion of one specific cone, the discovered defect was corrected. Many like examples are reflected by the record in these cases.
 
 
 14
 There can be no eyewitness to the vicissitudes and accomplishments of the rotary drilling bit operating under the earth's surface, at times to a depth of as much as three miles. Operating conditions and performance can be and are carefully noted, but they do not tell the whole story. It is only through examinations of the bits in the field, at field division points, and in the research laboratory, in the light of the record of each particular bit, that the manufacturer can eliminate flaws, design improvements in the drilling qualities and increase the life of the bits. These have been accomplished by Hughes in a very large measure through its research department. As a result, Hughes enjoys the reputation of producing the best rotary drilling bit on the market.
 
 
 15
 At the present time, Hughes manufactures approximately 475 different sizes and types of bits, in order to accommodate the requirements of the industry in different size holes and in different formations. Availability of used bits to compare performance of similar types and sizes, different sizes of the same type, and different sizes and types in different formations is essential to the carrying on of Hughes' research program and the improving of its bits. In one year, Hughes leased 18,000 experimental bits. Return of these bits and also of the standard bits run under similar conditions was essential to Hughes' research and development program. A dull standard bit is the yardstick by which Hughes measures the relative merits of tis experimental bits.
 
 
 16
 It was only through the recovery of the Hughes bits at the end of their useful life, and examinations, tests, and analyses in its research department, that Hughes has been able to accomplish its phenomenal success in the designing and manufacture of rotary drilling bits.
 
 
 17
 Hughes has manufactured through the years, and is today manufacturing and supplying to the industry, the best rotary drilling bits made by any manufacturer. This is established, not only by Hughes' witnesses, but by witnesses for the defendants. The first witness called by the defendants, who was engaged in the drilling of oil and gas wells, testified that between 80 and 85 per cent of the bits used by him were Hughes bits, and that while he could use bits of other manufacturers, he used the Hughes bit because 'it was the best bit that was built in the world, in my opinion.'
 
 
 18
 The practice of retipping rotary drilling bits commenced in a small way in 1936. Conaghan began retipping bits in 1937 or 1938, but discontinued after a short time, and began to retip again in 1944. Ford began retipping bits in July, 1944, and was so engaged until 1950. Cole has been retipping since April, 1946. There was no extensive use of retipped bits until 1937. The practice of retipping bits began long after Hughes adopted its informal leasing practice and its formal leasing contract in 1934.
 
 
 19
 Ordinarily, when the teeth of a bit have become so worn from use that the original cutter teeth have served their useful life, the bearings are practically worn out, and the useful life of the bit is at an end. Generally, a bit once placed in a hole is not withdrawn until its useful life has ended. However, in a limited number of the bits the bearings survive the life of the original teeth and the restoring of the original teeth by retipping makes possible the further use of such bits in the drilling of soft formations. Only a small percentage, perhaps 12 to 15 per cent, of bits are susceptible to the retipping process.
 
 
 20
 Each of the defendants has been engaged in the same type of operation. Each has acquired dull bits leased by Hughes, either from a drilling contractor or by purchase from a 'roughneck' or from a person acquiring and selling stolen bits. Each defendant has reconstructed the teeth on the bits and then sold the retipped bit, either to the person from whom the dull bit was acquired, or, in many instances, to someone else. The retipping process was described by this court in Williams v. Hughes Tool Co., 186 F.2d 278, 282, as follows:
 
 
 21
 'Williams is engaged in the business of retipping bits on which the original teeth are worn out, and returning the bits to the lessees thereof for further use. Williams first washes the bits. With an acetylene torch and tungsten tube metal, he then restores each worn tooth as nearly as possible to its original form, size and position. He keeps the bit and those teeth on which he is not working during the retipping process submerged in water to prevent loss of temper. Williams retips bits which have been worn through use to an extent that the original teeth have served their useful life.'
 
 
 22
 The defendants' retipping differs from that described by this court in only one material respect. Williams restored the teeth to their original form, size and position. In some instances in the instant cases, the defendants took dull Hughes bits which never embodied the improvement embraced in the Scott, et al. Patent No. 2,333,746, and modified the tooth structure to conform to Hughes bits embodying the device of that patent. The device of that patent is particularly designed to drill in the softer formations, the kind of formations in which retipped bits are ordinarily used.
 
 
 23
 The evidence disclosed that many of the bits purchased or received by the defendants for retipping had been stolen and that the defendants accepted any bits that came to them, knowing that traffic was being carried on in stolen bits, and without any concern as to whether the rights of Hughes were being invaded.
 
 
 24
 Two of the six Hughes bits found in the possession of Ford contained experimental features. The two bits had been leased in the regular course of business, without disclosing the fact that they embodied experimental features, to insure the use of the bit under normal conditions. The retipping of the bits prevented the examination in the research department of Hughes of the experimental dull bits after their normal run.
 
 I.
 
 25
 The Counterclaims.
 
 
 26
 In his opinion in the Ford case, D.C., 114 F.Supp. 525, 544, Judge Wallace stated that the object of the leasing practice of Hughes was to enable it 'to make certain that the majority' of its bits would not be repaired and used again in competition with its new bits and 'that the paramount aim' of the leasing practice 'was to promote sales rather than to achieve engineering perfection.' Those statements were completely refuted by competent and credible witnesses who had full knowledge of the facts with respect to the reasons for the adoption by Hughes of its leasing practice.
 
 
 27
 We disregard, and Judge Wallace should have disregarded, the testimony of defendants' witness, Mobley, primarily for the reason that it was clearly pure hearsay and also because substantially all of the material portions of such testimony constituted disclosures of confidential information which came to him in his capacity as attorney for Hughes and was inadmissible under the rule which precludes disclosure of privileged communications between attorney and client. Mobley was an associate of the law firm of Andrews, Kelley, Kurth & Campbell from October 3, 1931, until September 1, 1939. During that period such firm was legal counsel for Hughes. As a member of the firm assigned to serve Hughes, Mobley had access to Hughes' files and familiarized himself therewith. His actions and communications during that time were in his capacity as lawyer for Hughes. What he did in his connection with the leasing agreement was in his capacity as such lawyer. In a deposition taken in Chicago, in Chicago Pneumatic Tool Co. v. Hughes Tool Co., 10 Cir., 97 F.2d 945, and introduced in the instant cases, Mobley testified that he knew nothing of his own knowledge with respect to the reasons for the adoption of the leasing agreement by Hughes, and that all he knew with respect thereto was hearsay. He reiterated that testimony in the instant cases.
 
 
 28
 Responsible administrative employees of Hughes at the time the leasing practice was inaugurated and at the time the formal leasing contract was adopted, who had full knowledge of the facts, testified that the purpose of the leasing practice was to enable Hughes to repossess worn-out bits for field inspection and examination, for laboratory tests and analyses, for comparison of their performance with other bits, including experimental bits, for the discovery and correction of defects in its bits, and to improve the quality, efficiency and drilling life of its bits. That testimony is fully corroborated by facts and circumstances established by uncontroverted evidence in the record. Those facts and circumstances are these: The leasing practice was adopted and put into operation by Hughes long before the beginning of the retipping of bits. It delivers to the driller the size and type of bit best suited for the formation in which it is to be used. Hughes keeps a record of performance of every bit which it leases. It repossesses the wornout leased bits and subjects them to field inspection and examination by its engineers, and, in a great many instances, to laboratory tests and analyses. It compares the performance of different bits in different formations and under different drilling conditions, including the performance of experimental bits. That repossession of wornout bits is essential and necessary to the carrying out of Hughes' research program was clearly established by the evidence, both of Hughes' witnesses and other disinterested witnesses. The majority of Hughes' used bits are not susceptible of retipping. In only a small percentage of such bits is the additional life of the bearings sufficient to justify retipping. The following facts and examples show the comparatively minor part that retipped bits play in the drilling industry. Throughout the United States in 1950, in 1951, and the first half of 1952, Magnolia Petroleum Company ran 16,996 bits, of which 13,573 were new Hughes bits and none were retipped bits. Magnolia had theretofore used retipped bits, but had discontinued their use. In the same period, Phillips Petroleum Company has materially decreased. In the first nine months of 1952, in Oklahoma and Kansas, Phillips Petroleum Company ran 586 bits, of which 484 were new Hughes bits and only three were retipped bits. In the first seven months of 1952, in Oklahoma and Kansas, Loffland Brothers[4] ran 482 new bits, of which 362 were Hughes bits and none were retipped bits. In the first nine months of 1952, in the same area, Noble[4] ran 1,994 bits, of which 1,736 were new Hughes bits and only five were retipped bits. In 1950, 1951, and the first half of 1952, Loffland, in the entire United States, ran 33,906 bits, of which 27,124 were new Hughes bits and only 143 were retipped bits. In the same period and area, Noble ran 26,617 bits, of which 23,186 were new Hughes bits and only 53 were retipped bits. The foregoing show that Hughes is concerned, not with competition of retipped bits, but with interference with its research program by bits falling into the hands of retippers and not being delivered to it for research purposes.
 
 
 29
 The fact that Hughes has proceeded against retippers in Oklahoma, Texas and adjoining states, and not in the area east of the Mississippi River and north of the Gulf Coast States, does not militate against the conclusion we have reached. In 1950, 24,157 new Hughes bits, 5 per cent of its production, were used in such area. In the same year, in the States of Texas, Oklahoma, and in adjoining states, where Hughes has undertaken to prevent retipping, 361,707 new Hughes bits were used. That constituted 83 1/2 per cent of its total production. It is only natural that Hughes should concentrate its efforts to prevent unlawful retipping in areas where there was the greatest interference from retipping with its research program. The fact that Hughes has not proceeded against retippers in the area east of the Mississippi River and north of the Gulf Coast States, where a large amount of retipping is practiced, but where only a small proportion of Hughes' output of bits is used, and, therefore, where retipping results in comparatively insignificant interference with its research program, and has undertaken to prevent retipping in areas where the major portion of its bits is used and retipping will greatly interfere with its research program, demonstrates that the purpose of Hughes' leasing agreement and its enforcement thereof is not the elimination of competition by retipped bits, but to insure the availability of Hughes bits for research and development purposes and to protect its research program.
 
 
 30
 No doubt the leasing practice has indirectly increased the use of Hughes bits, but that is because it has enabled Hughes to furnish the drillers with the best available bits for use in particular formations and under particular drilling conditions, and to greatly improve the quality, efficiency and drilling life of its bits, and to produce, as it has, the best rotary drilling bits manufactured.
 
 
 31
 It is fairly inferable from the record that there has been no objection or resistance to Hughes' leasing practice or the form of the lease agreement by producing oil companies or drilling contractors. It would be only natural for them to freely accept Hughes' leasing practice, which is essential to Hughes' research program and which has resulted in great benefits to the drilling industry.
 
 
 32
 In United States v. United Shoe Machinery Corp., D.C. Mass., 110 F.Supp. 295, 316, which involved leases of shoe machinery, the court did not condemn leasing as a practice or the requirement that the leased device be returned to the lessor at the termination of the lease period. What it did condemn was the length of the lease term and certain restrictive provisions in the lease involved in that case. There, the lessees were required to accept leases for 10-year terms. The lease contained a provision that the lessee would use the leased machinery 'to its full capacity upon all * * * footware * * * made by or for the lessee in the manufacture * * * of which such machinery is capable of being used, * * *.' It required the lessee to obtain from the lessor, exclusively, all duplicate parts, extras, mechanisms, and devices of every kind needed or used in operating, repairing, or renewing the leased machinery. As a matter of practice, the lessor assumed the burden of keeping the leased machinery in good order, making no separate charge for such service, but charging only for the parts required. The lease contained provisions for deferred payments which adversely affected the lessees who used competitors' machines. Such payments were greater when the lessees used competing machines. The lease also provided for an amortization plan, called a 'Right of Deduction Fund', under which lessees received amortization benefits, which made it advantageous for the lessees to use exclusively the machines of the lessor, and if a lessee used machines of competitors, his rights under the deduction fund were substantially decreased. The court held that the long lease term made the lessee 'reluctant to experiment with a competitive machine to the extent he would wish' and deprived competitors of a chance to have their machines adequately tried out by shoe manufacturers, and that under the terms of the lease if a manufacturer preferred a competitor's machine to the lessor's on hand 'he may not know the exact rate at which future payments may be commuted' and that such provisions with respect to payment were not made solely for revenue, but were also for protection against competition, and were discriminatory as to a lessee who installs a competitor's machine; that the use by a lessee of machines of competitors had a substantially adverse effect on his rights under the deduction fund; and that the practice of the lessor of rendering repair service only on its own machines and without separate charge had brought about a situation in which there were almost no large-scale independent repair companies, which situation had created a serious stumbling block to foreign manufacturers who had sought to compete with the lessor. In its decree, the court did not enjoin the use of leases. It required that the maximum term of the leases should be five years; that provisions should be made giving the lessee the right to return the leased machinery at any time after one year; that provision for deferred payments, under which lessees who installed competitive machinery were discriminated against, should be eliminated; that the provision for a deduction fund should be eliminated; and that the lessor should not provide any service for the leased machines, except upon the basis of separate and reasonable charges for the services rendered.
 
 
 33
 In the instant cases, Hughes' lease in nowise interferes with the right of the lessees to use bits of competitors and they do use such bits. It contains no provision which makes it disadvantageous for the lessees to use bits of competitors. The reason the lessees use more Hughes bits is that Hughes offers to the industry a better bit than any other manufacturer.
 
 
 34
 The decree in the United Shoe case did provide that after a designated time the lessor, if it offered any type of its machines for lease, should also offer such type for sale. But, it should be observed that the court in that case found that a shoe manufacturer 'may pychologically or economically be more impeded by a leasing than by a selling system'; that the objectionable features of the leasing system involved in that case have had such 'a special deterrent effect,' and that the court was there confronted with correcting a condition that had resulted from a leasing system designed to prevent, and which had prevented, competition. No such condition exists here. The Hughes lease has not deterred nor tended to deter a driller from acquiring and using bits made by Hughes' competitors.
 
 
 35
 Of the many improvements in roller rock bits developed by Hughes' engineers, some have been found to be patentable. In some such instances, Hughes has patented its improvements and thus acquired a right for 17 years to exclude others from practicing the inventions in return for the disclosure of the inventions for the free use of the public after the end of such period. Since January 1, 1935, 38 patents pertaining to roller cutter bit structures have been issued to Hughes. Each of the patentees was an employee of Hughes at the time each of the applications for such patents were filed. In the same period there were granted 282 patents on similar types of bits to competitors of Hughes and to others. Of the total number of 320 patents on roller cutter type bits issued since 1935, 48 were issued to Hughes' competitor, Reed Roller Bit Company; 58 to Hughes' competitor, Chicago Pneumatic Tool Company; 37 to Zublin, and 32 to Globe Manufacturing Company. The 107 remaining patents issued in the same period were granted to others, some of whom may also be competitors of Hughes. It clearly appears from the record that the inventions which have contributed most materially to the improvement of rotary drilling bits are to be found in the patents issued to Hughes, which comprise approximately 12 per cent of all such patents issued in the period. A number of such patents have now expired and their disclosures are free for use by Hughes' competitors. Hughes utilized its inventions to improve its bits and made them available to the industry, in many instances, before the patent was granted. Its policy in that respect is illustrated by its development and placing on the market of the improvement disclosed by Patent No. 2,333,746. The first field tests of the bit embraced in that patent were made in January, 1940, by one of Hughes' engineers, stationed at Midland, Texas. By May, 1940, newly designed factory produced bits had been manufactured, run, inspected, and some of them returned to the research laboratory for further detailed examination. About a year and one-half after the first testing of the bit and even prior to issuance of the patent, the bits were already in wide use and largely responsible for an annual saving in drilling costs in the Texas Midland district of about 24 per cent.
 
 
 36
 'The mere accumulation of patents, no matter how many, is not in and of itself illegal.'[5] Of course, there must not be a misuse of the patent monopoly. Here, there was no such misuse by Hughes.
 
 
 37
 In Williams v. Hughes Tool Co., 10 Cir., 186 F.2d 278, certiorari denied 341 U.S. 903, 71 S.Ct. 612, 95 L.Ed. 1342, rehearing denied 341 U.S. 934, 71 S.Ct. 802, 95 L.Ed. 1342, second petition for rehearing denied 341 U.S. 956, 71 S.Ct. 1013, 95 L.Ed. 1377, we held that Patents No. 1,856,627 and No. 1,983,316 were valid and were infringed by the defendant therein by retipping Hughes bits; that the reasons which motivated Hughes in leasing, rather than selling, its bits and in requiring the return thereof for inspection, testing and research were to improve the quality of its bits, to provide the proper bit for drilling in particular formations or in a particular area, to provide valuable information for drillers who use Hughes bits, and to maintain the high standard of Hughes products and to protect their reputation; and that the leasing contract was practical, reasonable and fair. We further held that the provisions of the leasing agreement did not bring Hughes within the provisions of the 'Tie-in' cases and that Hughes was not guilty of a misuse of its patents and had not violated the Clayton Act. In Robertson Rock Bit Co., Inc., v. Hughes Tool Co., 176 F.2d 783, certiorari denied 338 U.S. 948, 70 S.Ct. 487, 94 L.Ed. 585, rehearing denied 340 U.S. 923, 71 S.Ct. 355, 95 L.Ed. 666, second petition for rehearing denied 340 U.S. 939, 71 S.Ct. 487, 95 L.Ed. 678, the Fifth Circuit sustained the validity of the following Hughes patents: Fletcher Patent No. 1,856,627; Scott and Garfield Patent No. 1,983,316; F. L. Scott Patent No. 3,011,084, and the Garfield and Scott Patent No. 2,030,442, and held that the leasing agreement employed by Hughes did not constitute a misuse of such patents. In Williams Iron Works Co. v. Hughes Tool Co., 10 Cir., 109 F.2d 500, this court sustained the validity of the following Hughes patents: Scott Patent No. 1,480,014; Scott and Wellensiek Patent No. 1,647,753; Fletcher Patent No. 1,856,627 and Scott Patent No. 2,011,084.[6] In Chicago Pneumatic Tool Co. v. Hughes Tool Co., 10 Cir., 97 F.2d 945, this court sustained the validity of Hughes' Scott and Wellensiek Patent No. 1,647,753. In Williams v. Hughes Tool Co., 10 Cir., 1-9 F.2d 862, this court held, in effect, that Hughes' system of leasing bits did not constitute an unlawful exercise of Hughes' property and contract rights apart from its lawful patent monopoly.
 
 
 38
 Hughes has never brought an infringement suit upon a patent where it or its employees had not actually developed the patented device, proved it in the field, and engaged in the manufacture and leasing of such device.
 
 
 39
 The purpose of the infringement suits brought by Hughes was to protect its lawful patent monopoly and not to prevent lawful competition. In so doing, it was guilty of no misuse of its patents. Section 271 of the Act of July 19, 1952,[7] 66 Stat. 811, 35 U.S.C.A. § 271, in part provides:
 
 
 40
 '(d) No patent owner otherwise entitled to relief for infringement or contributory infringement of a patent shall be denied relief or deemed guilty of misuse or illegal extension of the patent right by reason of his having done one or more of the following: * * * (3) sought to enforce his patent rights against infringement or contributory infringement.'
 
 
 41
 It was only natural for Hughes to attack the unlawful retipping process at its source and to proceed against retippers who had brazenly trafficked in stolen Hughes bits and bits otherwise unlawfully acquired, rather than proceeding against producing oil companies and drilling contractors, many of whom were its own lessee customers. In so doing, no improper motives can be attributed to Hughes.
 
 
 42
 While we hold for the reasons hereinafter more fully set forth that Patent No. 2,333,746 is invalid for want of invention, Hughes was fully justified in bringing the instant actions for alleged infringement of that patent by the defendants. The bit covered by that patent was primarily designed for use in softer formations. That was a field in which Hughes' competitors had provided a more satisfactory bit. The bit covered by that patent met problems of drilling in the softer and more plastic formations, which Hughes, with all its research organization, theretofore had not been able to solve, and it enjoyed very substantial commercial success. By virtue of 66 Stat. 812, 35 U.S.C.A. § 282, that patent was presumed to be valid and the burden of establishing its invalidity rested upon the party asserting invalidity. Moreover, Chief Judge Vaught, a judge of long experience and recognized ability in the field of patent law, was of the opinion the patent is valid. In view of all these circumstances, it cannot be said that Hughes' claim that the patent is valid and infringed was in anywise without substantial basis, or that it acted in bad faith in attempting to assert its claimed rights under that patent.
 
 
 43
 A comparison of Hughes' patent policy, as reflected by the record in the instant cases and the policy of Kobe, Incorporated in Kobe, Inc., v. Dempsey Pump Co., 10 Cir., 198 F.2d 416, relied upon by Judge Wallace and counsel for the defendants, clearly distinguishes the Kobe case from the instant cases. In that case, Kobe designed a plan to monopolize the rodless pump industry by the acquisition of all the important patents in the field and the elimination of all actual and potentiol competitors.
 
 
 44
 When Kobe decided to enter into the business of manufacturing rodless pumps, it concluded it was essential to acquire certain patent rights held by one Crum and one Humphreys. The latter was a pump manufacturer. It was unable to obtain those patents immediately. Later, the Rodless Pump Company acquired the exclusive rights to the Crum and Humphreys patents, and other important patents relating to the hydraulic pump, and commenced the manufacture of such pumps. Kobe then entered into an agreement with Rodless to form a patent holding company which was organized under the name of Roko Corporation. The patents held by Rodless were transferred to Roko and it proceeded to acquire all of the important patents relating to rodless pumps, as well as to acquire future patents in that field. By the terms of the original agreement and subsequent agreements, Rodless was eventually entirely eliminated from the competitive field.
 
 
 45
 Typical of Roko's actions to eliminate competitors and potential competitors were two agreements, one entered into with Arthur Gage and the other with Alta Vista Hydraulic Company, a corporation organized and controlled by Gage. The agreement between Gage and Roko provided that for a consideration of $12,000 Gage would transfer to Roko seven patents held by him, free from any license agreements; that Gage would not engage in any business or accept any employment in any way detrimental to Roko or its licensees for a period of five years; that Gage would transfer to Roko any inventions or patents relating to rodless pumps, or which might be embodied in or used with rodless pumps competitive with those manufactured by Roko or its licensees which he might acquire within a 10-year period, and that neither Roko nor its licensees would ever be obligated to manufacture, sell or use any devices embodying the inventions of Gage. In the other agreement, Alta Vista further agreed that the license agreement to Roko was exclusive as to Alta Vista. The first agreement with Alta Vista also provided that royalties should be paid on the basis of the sale of Kobe pumps and not on the basis of pumps manufactured under patents licensed from Alta Vista. Kobe succeeded in acquiring control of all the known patents pertaining to the manufacture of hydraulic pumps and Roko actively engaged in the acquisition of all future patents in the field for the benefit of Kobe. After Kobe had acquired a complete patent monopoly, it began to engage actively in the manufacture of hydraulic pumps, but none of them embodied the inventions disclosed by the patents which it obtained from Gage, Alta Vista and others, with the possible exception of certain features of the Humphreys patents. Those facts in the Kobe case led the trial court to conclude in that case that the patents were acquired solely as insurance against competitive manufacture by others. For many years Kobe had an absolute monopoly in the manufacture of rodless pumps. When the Dempsey Pump Company, defendant in the Kobe case, threatened Kobe with competition, Kobe immediately brought a patent infringement suit, supplemented by a persistent effort by Kobe to create a customers' boycott of the Dempsey pump.
 
 
 46
 'Within the limits of the patentee's rights under his patent, monopoly of the process or product by him is authorized by the patent statutes.'[8]
 
 
 47
 'The very object of these laws (the patent laws) is monopoly * * *.'[9]
 
 
 48
 The incentive offered by the patent laws to encourage development in the arts and sciences is the monopoly given for a term of years. The anti-trust laws are not directed at lawful patent monopoly.[10]
 
 
 49
 In contracting for the use of his patent device, the patentee may impose restrictions on the use thereof, either as to time or space, or any other restriction upon the exercise of the granted privilege, save only, that he may not attach a condition to the right given that will enlarge the monopoly granted him by his patent, and thus acquire a monopoly which the statutes and the patent did not give him. Here, the Hughes lease agreement merely provided for the termination of the right to use on the happening of a future event, namely, the termination of the useful life of the original cutter teeth and/or the bearings. It was simply a limitation as to time.[11]
 
 
 50
 Section 3 of the Clayton Act does not impinge upon the lawful monopoly granted to a patentee, namely, the exclusive right to manufacture, use and vend the patented device. It does not prohibit him from inhibiting the manufacture, use or sale or restricting the manufacture, use or sale of the patented device by others.
 
 
 51
 It does prohibit the patentee from making a contract which imposes limitations beyond his lawful patent monopoly on the right of his lessee or purchaser to use or deal in goods, wares, merchandise, supplies, or other commodities of a competitor where so to do will substantially lessen competition or tend to create a monopoly.[12]
 
 
 52
 The Hughes lease contains no 'tie-in' provision, express or implied. It does not restrict in any way the right of the lessees to use or deal in the goods of a competitor.
 
 
 53
 In the Ford case, Judge Wallace found that since 1936, Hughes has dominated the rotary drilling bit industry. That conclusion is based primarily on the premise that Hughes manufactures approximately 75 per cent of the rotary drilling bits used in the drilling industry. The record discloses that such premise is based, not upon accurate evidence of the total bits manufactured, but upon incomplete and possibly inaccurate estimates of the total bits manufactures. However, for the purposes of this opinion, we will assume, without deciding, that the 75 per cent figure was approximately correct. During all of the period involved in the instant cases, Hughes has had a lawful patent monopoly, under one or more of its patents, the validity of which has been established by the adjudicated cases. The evidence clearly shows that the large volume of business which Hughes enjoys, especially with respect to its bits designed for drilling in medium and hard formations, is due to its lawful patent monopoly under its valid patents, unaccompanied by any 'tie-in' agreements or other unlawful competitive practices, and is due to the further fact that it manufactures the most efficient, the most economical, and the best bit on the market for use in the medium and hard formations and renders excellent service to users of its bits.
 
 
 54
 The purpose of the Sherman Act is to prevent restraint of trade and the monopolization of any part of trade or commerce,[13] to foster competition by lawful means and not to eliminate it.[14] The purpose of the Clayton Act is not to prevent competition, but to preserve legitimate competition and prevent unlawful and unfair discrimination and other unlawful competitive practices.
 
 
 55
 Moreover, the Sherman Act does not make mere size of a corporation, nor the continued exercise of its lawful power an offense, when that size and power have been obtained by lawful means and developed by natural growth. Neither does it make the existence of unexerted power an offense.[15]
 
 
 56
 The Sherman Act was not directed against one 'who happens by his skill and energy to command an innocent and legitimate monopoly of a business.'[16] One who gains a large portion of a market by manufacturing a better product and by furnishing better service to his customers, which constitutes legitimate competition, is not denounced by the Sherman Act.[17]
 
 
 57
 The maintenance of a research department, the carrying on of intensive research, constant efforts to improve the manufactured products and to render better service to customers by a manufacturer are not condemned by Sec. 1 and are not a violation of Sec. 2 of the Sherman Act.[18] That Act does not condemn business success, arising from quality and performance of a manufacturer's product.
 
 
 58
 Here, Hughes' position as the largest manufacturer and distributor of drilling bits is not attributable to any unlawful practice.
 
 
 59
 Any notion that Hughes controls the market or enjoys a monopoly in the rotary drilling bit industry is clearly refuted by the record. The Reed Roller Bit Company[19] has prospered and, in the past 15 years, has expanded its production of rotary drilling bits between 400 and 500 per cent. Chicago Pneumatic Tool Company,[20] a substantial corporation with a large volume of business, had expanded several times prior to the trial of the instant cases and was then engaged in another large expansion program in Texas, including the construction of a new plant, which would increase its then productive capacity two and one-half or three times. The Varel Manufacturing Company, which entered the business of manufacturing rotary drilling bits in 1947, had made a very substantial growth and had recently moved into a new and enlarged plant. The Security Engineering Company, manufacturer of rotary drilling bits, had recently completed a $2,000,000 plant in Dallas, Texas.
 
 
 60
 In the softer formations drag bits, disc bits, cross-roller bits and new cone bits are used. It was not until the development of the bit disclosed by Patent No. 2,333,746 that Hughes produced a bit that performed as well in the softer formations as the bits of Hughes' competitors. Since that patent is invalid, the disclosures thereof are free for use by Hughes' competitors. The bits of Reed are primarily designed for use in the softer formations. During the entire period involved, they afforded effective competition with Hughes bits, especially those designed for drilling in the softer formations, and, as elsewhere herein indicated, Reed has prospered and expanded the production of its bits between 400 and 500 per cent. Improved drag bits afford effective competition with the Hughes bits designed for drilling in the softer formations. Drag bits are used extensively in Gulf Coast shales. In 1951, 21 manufacturers were making and selling fish tail and drag bits. One manufacturer of a special designed rock cutter bit advertised that its improved bit would out-drill either drag or roller bits in the Gulf Coast shales, and in New Mexico had resulted in a saving in drilling time of 30 per cent over soft formation roller drilling bits. The Hughes bits which have enjoyed the greatest market success are those designed for drilling in the medium and hard formations. There, Hughes comes into competition with cross-roller bits and cone bits of other manufacturers. Diamond bits also come into direct competition with the Hughes bits designed for drilling in the harder formations. Many of the large oil developing companies have ceased to use Hughes bits and are using diamond core bits in certain types of the harder formations for the reason that the diamond core bit drills faster and is more economical, since it is not necessary to pull it out and change bits.
 
 
 61
 Retipped bits are not as sound metallurgically as new bits. They do not give the service that a new bit gives, and they are only practical for use in the softer formations. As soon as drilling progresses much beyond 3,000 feet, the cost of changing a bit will exceed the cost of a new bit. At greater depths a retipped bit will not be used. Hence, retipped bits do not come into competition with Hughes bits designed for drilling in the harder formations, the field in which Hughes enjoys its greatest market success.
 
 
 62
 Retipped bits in the competitive field are of comparatively minor importance.
 
 
 63
 Judge Wallace relied heavily upon the decision of the Second Circuit in United States v. Aluminum Co. of America, 148 F.2d 416. For many years prior to 1886 aluminum was isolated as a metal, but it was not until that year that it became commercially practical to eliminate the oxygen so that it could be exploited industrially. One Hall discovered a process by which this could be done in 1886 and obtained a patent on the process on April 2, 1889, which he assigned to the Aluminum Company. Bradley invented a process by which the smelting could be carried on without the use of external heat, which had theretofore been thought necessary, and obtained a patent on his process on February 2, 1892. He granted the Aluminum Company an exclusive license under his patent. During the period of the patents, the latter one expiring February 2, 1909, it was impossible for anyone to compete with the Aluminum Company in the manufacture of aluminum because of its patent monopoly and the Aluminum Company produced practically 100 per cent of aluminum ingot. In the district court, in that case, the United States conceded that there had been no unlawful monopolization by the Aluminum Company prior to February 2, 1909, for the reason that it was protected by its patent monopoly up to that date and that the monopoly in both bauxite and the manufacture of aluminum which it held at the expiration of said patents was lawful[21] The decree against the Aluminum Company in that case was based, not upon misuse of its patent monopoly, but upon monopoly resulting after the expiration of the patent period by reason of unlawful competitive practices. Here, Hughes has not been guilty of discrimination or other unlawful competitive practices.
 
 
 64
 The record discloses that when Hughes changes the prices of its bits, its competitors change their prices to correspond with the prices set by Hughes.
 
 
 65
 Hughes published a price change on May 25, 1934. On August 1, 1935, Reed published a price list which followed the prices fixed by Hughes in 1934. More recently, Reed, when Hughes increased the price of its bits, followed with a like increase on the day following the announcement of the Hughes increase, and other competitors increased their prices to correspond to the Hughes prices within a few weeks after the Hughes increase.[22]
 
 
 66
 The record is devoid of any evidence of any understanding, arrangement, or agreement, express or implied, between Hughes and other bit manufacturers to fix the price of bits. Moreover, Hamaker, vice president in charge of sales, of Reed, testified that there was no such understanding or agreement. Miller, manager of the Oil Tool Division of Chicago Pneumatic, testified to the same effect. Hughes' president, its executive vice president, its senior vice president and manager, and other sales personnel denied that there was any understanding or agreement with Reed or any other of Hughes' competitors to fix prices. Hamaker testified that with rising costs, Reed desired to increase its prices, but was reluctant to take the lead in price increases and preferred to follow others. He further testified that when price increases were made, Reed learned of it immediately. He further testified that while Hughes was the largest bit manufacturer, it did not dominate the price of bits fixed by Reed, and did not prevent Reed from fixing its prices at more or less than the prices fixed by Hughes, and that Reed followed the price increases made by Hughes because it was advantageous for it to do so. Other witnesses testified that it was common to find competitors having the same or similar prices for similar goods, and that there were many examples of price changes made by competitors immediately after another competitor had changed its prices. One witness testified that such changes usually were made within periods varying from one hour to two weeks.
 
 
 67
 The mere fact that Reed increased its prices the day following an increase by Hughes does not indicate any prearrangement. Hughes sent out notice of proposed increases and that fact immediately became known to Reed and other competitors of Hughes.
 
 
 68
 The record does not support the statement of Judge Wallace in the Ford case that a price change could not be brought about immediately and without painstaking research and preparation.
 
 
 69
 That might be true of a price decrease, but certainly it would not be true of a price increase. Competitors knew that rising costs necessitated a price increase and they were ready to increase their prices whenever Hughes increased its prices.
 
 
 70
 The testimony of responsible officials of Reed and Chicago Pneumatic shows that other rotary drilling bit manufacturers followed Hughes' prices in the exercise of their own judgment and in order to offset increasing manufacturing costs and make greater profits.
 
 
 71
 The fact that Reed and other manufacturers of rotary drilling bits could price their product at the same price of corresponding bits manufactured by Hughes and sell them in increasing numbers and at substantial profits, as shown by this record,[23] indicates competition and not lack of competition with Hughes. Moreover, the fact that competitors may see proper, in the exercise of their own judgment, as in the instant cases, to follow prices of another manufacturer, does not establish any suppression of competition or show any sinister domination.[24]
 
 
 72
 Judge Wallace points to the profits made by Hughes as indicative of price control, and counsel for the defendants urge that such profits 'are certainly an indication of monopoly prices' and cite in support thereof United States v. Eastman Kodak Co., D.C.N.Y., 22y F. 62. The evidence in the Eastman Kodak case showed that the defendant in 15 years' time bought out 20 competitors, dismantled their plants, purchased the entire control of the imported raw paper, which was the only standard paper for manufacturing photographic printing-out paper, refused to sell such paper to competitors, fixed resale prices, and made profits of 63 per cent. No such facts exist in the instant cases. We set out Hughes' profits before taxes for the period from 1940 to 1951, inclusive, in marginal note 25.[25]
 
 
 73
 Counsel for the defendants point to their Exhibit 64, a Standar & Poor's publication, which they say reflects the profits 'for similar type of manufacturing.' The publication reflects only the profit record of two manufacturers of rotary drilling bits, Chicago Pneumatic and Ingersoll-Rand Company. Counsel for the defendants state that Hughes admits for the years 1940 to 1945, its profits varied from 23.4 per cent to 32.4 per cent before taxes, except for the year 1945, which they say was apparently a conversion year. They fail to point out that in the same period, Chicago Pneumatic's profits varied from 25.8 per cent to 39.3 per cent and Ingersoll-Rand's profits varied from 26.1 per cent to 37 per cent. During the period 1940 to 1945, the average annual profits of the three companies before taxes were: Chicago Pneumatic, 32.7 per cent; Ingersoll-Rand Company, 30.7 per cent; Hughes Tool Company, 25.2 per cent.
 
 
 74
 The same Exhibit 64 states, 'Since overhead is relatively inflexible and accounts for a large proportion of manufacturing costs, profit margins are volatile. Spreads tend to widen sharply as volume expands beyond the break-even point. * * *' During the period 1946 to 1941, inclusive, Hughes' leases of rotary drilling bits more than doubled. With a relatively inflexible overhead, Hughes' profits necessarily increased. But the net profits enjoyed by Hughes were not exorbitant. For the period 1940 to 1951, inclusive, Hughes' net profits were
 
 
 75
 1940-- 23.47 per cent
 1941-- 22.39 per cent
 1942-- 14.03 per cent
 1943-- 15.29 per cent
 1944-- 15.89 per cent
 1945-- 7.64 per cent
 1946-- 20.02 per cent
 1947-- 24.55 per cent
 1948-- 26.18 percent
 1949-- 25.77 per cent
 1950-- 23.25 per cent
 1951-- 17.01 per cent
 
 
 76
 In his opinion in the Ford case, Judge Wallace concluded that Hughes had engaged in an 'invasive sales policy'. The conclusion is predicated first on the fact that Hughes changed from delivery of its bits through supply houses to a direct delivery to customers, in order that its sales personnel 'would regularly visit all active drilling rigs.' Of course, there is nothing inherently wrong in sales personnel visiting customers. Moreover, the reason which actuated the change was not the one suggested by Judge Wallace. Direct delivery was made, in order that the bit delivered would be best suited to the driller's requirements and to maintain a record identifying each bit delivered, obtain a record of its performance during its useful life and secure its return for research purposes. Such conclusion is based on the further premise that Hughes made an improper use of the royalty reports made by Reed to Hughes as patent licensor. The royalty reports showed sales, less returns of Reed complete bits and spare parts by sizes, but showed nothing with respect to customers or areas. Hughes' sales force in the field checked in the respective areas with supply companies and reported sales of each type in each area. This was done to check the accuracy of the reports submitted by Reed. Reed was a substantial competitor of Hughes, but all that Hughes did was to endeavor to meet by lawful methods Reed's competition. The Reed bits were outperforming the Hughes Simplex bit. Hughes met that competition by developing and putting on the market an improved product. The conclusion is further based on correspondence between Hughes and the Bethlehem Steel Company, with respect to Chicago Pneumatic. Charles M. Schwab was an executive of Bethlehem and held a large interest in Chicago Pneumatic. Because of intimate relations between Bethlehem and Hughes, Bethlehem had access to Hughes' plant and had been permitted to study Hughes' manufacturing and heating treatment methods and to learn what the analyses of all steel entering into Hughes' production disclosed. What Hughes protested against was the use of that confidential information for the benefit of Chicago Pneumatic. It was not undertaking to prevent competition, but to prevent use of confidential information to further unfair competition. Hughes did not threaten to cut off its purchases from Bethlehem. It indicated merely that the confidential relationship under which Bethlehem had access to Hughes' plant, which in turn gave it access to important information with respect to Hughes' processes, had to be terminated.
 
 
 77
 In his opinion, Judge Wallace stated that 'the 'effect' achieved by the lease agreement * * * is clearly within the broad language of Section 3 of the Clayton Act'.[26]
 
 
 78
 15 U.S.C.A. § 14 (Sec. 3 of the Clayton Act) provides:
 
 
 79
 'Sale, etc., on agreement not to use goods of competitor
 
 
 80
 'It shall be unlawful for any person engaged in commerce, in the course of such commerce. to lease or make a sale or contract for sale of goods, wares, merchandise, machinery, supplies, or other commodities, whether patented or unpatented, for use, consumption, or resale within the United States or any Territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States, or fix a price charged therefor, or discount from, or rebate upon, such price, on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods, wares, merchandise, machinery, supplies, or other commodities of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce.'
 
 
 81
 The language of Sec. 3, 15 U.S.C.A. § 14, supra, makes it clear that the lease, sale, contract or practice prohibited is one that imposes a condition, agreement or understanding that the lessee or purchaser shall not use or deal in goods, wares, merchandise, machinery, supplies or other commodities of a competitor or competitors of the lessor or seller. The Hughes leasing agreement contains no such condition, agreement, or understanding, express or implied. Lessees were entirely free, so far as the provisions of the leasing agreement are concerned, to lease, purchase or use bits of Hughes' competitors, including bits reconstructed by retippers.
 
 
 82
 We conclude there was no violation of the Clayton Act.
 
 
 83
 Upon a careful consideration of the entire record, we conclude that the findings made by Judge Wallace in the Ford case, upon which he based his conclusion that Hughes had violated the Sherman Act and the Clayton Act, are clearly erroneous, and that the findings made by Judge Vaught in the Conaghan and Cole cases, which are converse to those made by Judge Wallace on such issues, are clearly supported by the evidence and should be adopted by this court.
 
 
 84
 Patent No. 2,333,746.
 
 
 85
 Patent No. 2,333,746, known as the Scott, Garfield and Cockrum patent,[27] the individuals named being assignors to Hughes, was issued November 9, 1943, upon an application filed July 11, 1940. It relates to the formation of the teeth upon the drill cutters of rotary drilling bits.
 
 
 86
 Fletcher, by his invention in Patent No. 1,856,627, in suit in Williams v. Hughes Tool Co., 10 Cir., 186 F.2d 278, achieved two substantial improvements in the efficiency of rotary drilling bits. (1) Fletcher reduced the number of teeth on the cutter, except the teeth on the outer row, and thereby increased the weight unit loading upon each tooth, and increased their penetration and effectiveness; (2) Fletcher also positioned the teeth, other than the teeth in the outer row on the cutter, out of alignment longitudinally. Such staggering of the teeth inside the outer row of teeth eliminated the tendency of the teeth to drag and bounce from one row to the other as the cutter revolved and thus effected more uniform cutting of the entire bottom of the hole. Fletcher did not attain his objectives with respect to the outermost rows of teeth on the rotating cutters. Such teeth cut the outermost portion of the hole and provide the traction for the rotating cutters. In the patent in suit, the problem was solved as to the outer row of teeth on the cutters by providing what the patentee calls 'interrupted teeth' with crests that are shorter than those on other teeth in the outer rows of the cutters. In such patent there is also substituted for two or more circumferential rows of the teeth at the heel or adjacent to the base of the cutter, one row of teeth with long crests interspersed with interrupted teeth of shorter crests. In such patent the interrupted teeth are also staggered, as taught by Fletcher, so that the teeth in the rows do not continuously track in their previous imprints made upon the bottom of the hole, in order to accomplish uniform cutting of the entire bottom of the hole.
 
 
 87
 By forming teeth with shorter supporting crests, greater space is provided into which material displaced by the chisel stroke of the teeth may move, enabling the flushing fluid in the hole to better engage and carry away the displaced material and preventing ballingup of the cutter teeth.
 
 
 88
 Scott and Wellensiek Patent No. 1,647,753, in suit in Williams Iron Works Co. v. Hughes Tool Co., 10 Cir.m 109 F.2d 500, taught the use of widely spaced teeth that would readily free themselves of adhering material through the force of the flushing fluid.
 
 
 89
 The claims in suit are numbers 1 and 4, which read as follows:
 
 
 90
 '1. In a well drill, a tapered cutter rotatably mounted thereon, said cutter having a row of heel teeth circumferentially thereof to cut the outer portion of the well bottom, some of the teeth in said row having a portion projecting from the cutter surface a shorter height than the others, thus providing on said shorter teeth an open area normally out of contact with the well bottom so as to allow cleaning of the cutter by the flushing fluid, and a gage cutting surface on the outer ends of all said teeth to engage the wall of the well.
 
 
 91
 '4. In a well drill, an inwardly tapering cutter having a row of teeth circumferentially around the same, outer ends of which are positioned to cut the side wall of the hole, there being crests on said teeth positioned to engage the bottom of the well, the crests on some of said teeth being comparatively short and extending from the inner ends of said teeth approximately one-half of the length of the tooth, there being formation receiving spaces at the outer ends of said short crested teeth some of said teeth being spaced more closely together in the row to throw the teeth out of step on bottom.'
 
 
 92
 The bit of the patent in suit was designed for use in soft formations, but it has been found to be efficient in formations somewhat harder than those for which it was originally developed.
 
 
 93
 The device of the patent in suit has enjoyed marked commercial success. It has increased drilling speed approximately 32 per cent and bit life approximately 25 per cent, thereby effecting a very substantial decrease in drilling costs.
 
 
 94
 Under 35 U.S.C.A. § 282, a patent is presumed to be valid and the burden of establishing invalidity rests on the party asserting it.
 
 
 95
 An improvement to be patentable must not only be new and useful, but must involve invention. 35 U.S.C.A. § 101.
 
 
 96
 A patent may not be obtained if the differences between the subject-matter sought to be patented and the prior art are such that the subject-matter as a whole would have been obvious to a person having ordinary skill in the art to which such subject-matter pertains. 35 U.S.C.A. § 103.
 
 
 97
 It is well settled that the mere carrying forward or extended application of an earlier idea or conception of another, involving a change only in form, proportion, or degree, where the same work is performed in the same way by substantially the same means, although with better results, is not invention.[28]
 
 
 98
 While the device of the patent in suit resulted in marked improvements over prior bits for drilling in soft formations, we think it merely carried forward and was a more extended application of the earlier teachings of Fletcher Patent No. 1,856,627 and the Scott and Wellensiek Patent No. 1,647,753 and involved only a change in form, proportion, or degree, whereby the same work is performed in the same way by substantially the same means, although with better results. We further think that the differences between the subject-matter of the patent in suit and the prior art would have been obvious to a person having ordinary skill in the art to which such subject-matter pertains.
 
 
 99
 Accordingly, we hold the claims in suit invalid for want of invention.
 
 
 100
 That part of the judgment in the Cole and Conaghan cases holding the claims in suit of Patent No. 2,333,746 valid and infringed and enjoining the infringement of such claims is reversed and such judgment in all other respects is affirmed. That part of the judgment in the Ford case which denied Hughes relief on the ground it had violated the Sherman and Clayton Acts and which awarded Ford relief on the counterclaim is reversed. Such judgment in other respects is affirmed, and the cause is remanded, with instructions to dismiss the counterclaims and proceed further in accordance with the views herein expressed.
 
 
 101
 One-half of the costs in this court in each case shall be assessed against the appellant and one-half against the appellee.
 
 
 102
 MURRAH, Circuit Judge (dissenting).
 
 
 103
 I would reverse Judge Vaught and affirm Judge Wallace for precisely the reasons set forth in the opinion by Judge Wallace, reported D.C., 114 F.Supp. 525.
 
 
 104
 It is my view that the factual distinctions he so meticulously draws between these cases and prior litigation are clearly and abundantly supported by the conclusions he reached. I can add nothing to the fullness of the views expressed in his opinion.
 
 
 
 [1]
 Hereinafter called Hughes
 
 
 [2]
 15 U.S.C.A. § 1, 2
 
 
 [3]
 15 U.S.C.A. § 15
 
 
 [4]
 Loffland Brothers and Noble are the two largest independent drilling contractors
 
 
 [5]
 Automatic Radio Co. v. Hazeltine, 339 U.S. 827, 834, 70 S.Ct. 894, 898, 94 L.Ed. 1312
 
 
 [6]
 Claim 6 of such patent was held valid and Claims 7 and 8 invalid
 
 
 [7]
 An act to revise and codify the laws relating to patents
 
 
 [8]
 United States v. Line Material Co., 333 U.S. 287, 305, 68 S.Ct. 550, 559, 92 L.Ed. 701/
 
 
 [9]
 Bement & Sons v. National Harrow Co., 186 U.S. 70, 91, 22 S.Ct. 747, 755, 46 L.Ed. 1058
 
 
 [10]
 Vulcan Mfg. Co. v. Maytag Co., 8 Cir., 73 F.2d 136, 138; United Shoe Machinery Co. v. La Chapelle, 212 Mass. 467, 99 N.E. 289, 291
 
 
 [11]
 Williams v. Hughes Tool Co., 10 Cir., 186 F.2d 278, 284
 
 
 [12]
 Steiner Sales Co. v. Schwartz Sales Co., 10 Cir., 98 F.2d 999, 1007, 1008, and cases cited in Notes 10 and 11 thereto
 
 
 [13]
 United States v. Yellow Cab Co., 332 U.S. 218, 225, 67 S.Ct. 1560, 91 L.Ed. 210
 
 
 [14]
 Standard Oil Co. v. Federal Trade Commission, 340 U.S. 231, 248, 249, 71 S.Ct. 240, 95 L.Ed. 239; American Column & Lumber Co. v. United States, 257 U.S. 377, 400, 42 S.Ct. 114, 66 L.Ed. 284; Apex Hosiery Co. v. Leader, 310 U.S. 469, 493, 60 S.Ct. 982, 84 L.Ed. 1311; and Note 15 thereto; Standard Oil Co. v. United States, 221 U.S. 1, 78, 31 S.Ct. 502, 55 L.Ed. 619; White Bear Theatre Corp. v. State Theatre Corp., 8 Cir., 129 F.2d 600, 604; Northwestern Oil Co. v. Socony-Vacuum Oil Co., 7 Cir. 138 F.2d 967, 970; Oxford Varnish Corp. v. Ault Wiborg Corp., 6 Cir., 83 F.2d 764, 767
 
 
 [15]
 United States v. United States Steel Corp., 251 U.S. 417, 451, 460, 40 S.Ct. 293, 64 L.Ed. 343; United States v. International Harvester Co., 274 U.S. 693, 708, 47 S.Ct. 478, 71 L.Ed. 1302; United States v. Aluminum Co. of America, 2 Cir., 148 F.2d 416, 430
 
 
 [16]
 21 Cong.Rec. 3151 (1890)
 
 
 [17]
 In re Greene, C.C.S.D. Ohio, 52 F. 104, 115; United States v. American Naval Stores Co., C.C.S.D. Ga., 172 F.455, 459; United States v. Standard Oil Co., C.C.E.D. Mo., 173 F. 177, 191
 
 
 [18]
 United States v. E. I. DuPont de Nemours & Co., D.C. Del., 118 F.supp. 41, 216, 217
 
 
 [19]
 Hereinafter called Reed
 
 
 [20]
 Hereinafter called Chicago Pneumatic
 
 
 [21]
 United States v. Aluminum Co. of America, D.C.N.Y., 44 F.Supp. 97, 115
 
 
 [22]
 On July 23, 1948, Hughes sent out a notice by telegram of a price increase of 12 per cent, effective July 24. On July 24, Reed sent a telegram to supply companies, stating that on July 25, its prices would be increased 12 per cent. Chicago Pneumatic, H. C. Smith Tool Company, and Globe Oil Tool Company raised their prices within a few weeks thereafter. On November 30, 1950, Hughes sent a telegram to a supply company stating that on December 1, its prices would be increased 10 per cent. Reed sent a telegram to its supply companies on December 1, setting out a price increase on certain of its products at 10 per cent and on others of its products at 5 per cent
 
 
 [23]
 Reed and Chicago Pneumatic were not feeble competitors, dominated by Hughes. In 1951, Chicago Pneumatic produced and sold 25,000 roller bits and at the time of the trial was in the midst of an expansion program, which would increase its production in excess of 60,000 roller bits
 Hamaker testified that in the past 15 years this business had increased four or five times and it has maintained a strong position in the industry.
 
 
 [24]
 United States v. International Harvester Company, 274 U.S. 693, 708, 709, 47 S.Ct. 478, 71 L.Ed. 1302; United States v. United States Steel Corp., 251 U.S. 417, 448, 449, 40 S.Ct. 293,64 L.Ed. 343
 
 
 [25]
 1940-- 30.8 percent
 1941-- 32.4 per cent
 1942-- 23.4 per cent
 1943-- 25.4 per cent
 1944-- 26.4 per cent
 1945-- 12.7 per cent
 1946-- 32.3 per cent
 1947-- 39.6 per cent
 1948-- 42.2 per cent
 1949-- 41.5 per cent
 1950-- 48.4 per cent
 1951-- 53.1 per cent
 
 
 [26]
 The counterclaims did charge a violation of the Clayton Act
 
 
 [27]
 Hereinafter referred to as the patent in suit
 
 
 [28]
 B. F. Goodrich Rubber Co. v. Gates Rubber Co., 10 Cir., 54 F.2d 580, 582, 583; Linville v. Milberger, 10 Cir., 34 F.2d 386, 388, 389; Sage v. Parkersburg Rig & Reel Co., 10 Cir., 80 F.2d 954, 957; Sinclair Refining Co. v. Coe, 78 U.S.App.D.C. 176, 138 F.2d 673, 674